## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

FRED CREEK, a sole proprietor, d/b/a,    )
FRED AND SANDRA CREEK,    )
    )
        Plaintiff,    )
vs.    )    No.    CIV 07-0477 RB/LFG
    )
    )
VICTOR RODRIGUEZ, a sole proprietor,    )
    )
        Defendant.    )

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Motion for Preliminary Injunction (Doc.6), filed May 16, 2007.  Plaintiff seeks an order of this Court "enjoining [D]efendant . . . from using the mark ABQHOMES in his real estate business."  (Pl.'s Mot. Prelim. Inj. 1.)  Jurisdiction arises under 28 U.S.C. §§ 1331, 1367.  This Court filed an Order Granting Preliminary Injunction (Doc. 19), June 14, 2007, granting Plaintiff's motion; this Memorandum Opinion and Order expounds the Court's reasoning.

### I.    Background.

#### A.    Plaintiff and Plaintiff's allegations.

Plaintiff (Fred Creek, a sole proprietor doing business as Fred and Sandra Creek) has worked as a "licensed real estate agent" in Albuquerque, New Mexico since 1993.  (Am. Compl. 1.)  Plaintiff and Sandra Creek (Plaintiff's wife and business partner) ("the Creeks") are licensed real estate agents who sell residential real estate in the Albuquerque.  (F. Creek Decl. ¶12; S. Creek Decl. ¶1.)  Their qualifying broker is Richard Mather, d/b/a Coldwell Banker Legacy.  (Second F. Creek Decl. ¶10;

Pl.'s Reply Ex. 2.)  Over the past ten years, the Creeks "have achieved a significant and respected place in the New Mexico real estate market."  (Pl.'s Mem. in Supp. Mot. Prelim. Inj. 2; *e.g.*, F. Creek Decl. ¶11 ("Since [the late 1990s] my wife and I  . . . . have sold over $89,000,000 worth of real estate.  [In 2006], my wife and I placed 9th in sales volume in a group of more than 600 Coldwell Banker Real Estate Agents" located in Albuquerque).)  Plaintiff is a Certified Residential Specialist, "the highest designation awarded to sales associates in residential real estate."  (F. Creek Decl. ¶13 ("only 39,000 of the more than 1.35 million Realtors®  [in the United States] have earned the CRS designation").)

ABQHOMES is "a service mark used to identify [Plaintiff's ABQHomes.com] web site . . . . customers may [also] take it to be a trade name for Fred and Sandra Creek, Realtors®."  (Pl.'s Reply 9.)  Plaintiff has used the mark ABQHOMES for nine years.

In 1998, Plaintiff "registered the domain name ABQHomes.com as part of [his] decision to use the mark ABQHOMES for real estate advertising and marketing . . . and to develop an Internet web site."  (F. Creek Decl. ¶2.)  In 1999, Plaintiff and Sandra Creek, d/b/a "FRED AND SANDRA CREEK," began using "the service mark ABQHOMES (pronounced "A-B-Q HOMES") to promote" their residential real estate business.  (Am. Compl. 1-2; Ardalan Decl. ¶3.)  That year they launched ABQHomes.com.  (Ardalan Decl. ¶3.)  The site has always prominently displayed "ABQHomes.com or the service mark ABQHOMES . . . in large print . . . on the first page of the web site"; "ABQHomes.com has appeared on every subsequent page."  (*Id.* ¶4.)  Since early 2000 they have "used the mark ABQHOMES continuously and exclusively on [their] business cards, property flyers, client gift calendars, post cards, newsletters, radio and print ads."  (F. Creek Decl. ¶ 8; Parnegg ¶9 ("I know of no other Realtor® who has used this mark except for this very recent attempt by

[Defendant]").)

 Plaintiff registered the mark "ABQHOMES":

 with the New Mexico Secretary of State in March, 2000.  He registered ABQHOMES on the Supplemental Register of the United States Trademark Office in December, 2003.  He applied to register ABQHOMES on the Principal Register of the United States Trademark Office in March, 2007 under Section 2(f) of the Lanham Act . . . . This application is pending.

(Pl.'s Mem. in Supp. Mot. Prelim. Inj. 5 (citations to declarations, and exhibits thereto, omitted); V. Rodriguez Aff. ¶13; Countercl. ¶12. )

 Plaintiff states that ABQHomes.com "is one of the earliest, most popular and content rich real estate sites showing Albuquerque homes for sale on the Internet."  (Ardalan Decl. ¶5; *e.g.*, F. Creek Decl. ¶5 ("Consumers from all 50 states have e-mailed [the Creeks] at ABQHomes.com to inquire about real estate in Albuquerque.").)   In April 2007, Plaintiff's site received 14,402 hits.  (Ardalan Decl. ¶7.)   Of these visitors, 19.7 % "typed the exact words ABQHomes.com into their web browser," rather than using a search engine to access Plaintiff's site.  (*Id.* ¶8.)  "The average visitor views 20.35 pages on the site."  (*Id.* ¶7.)   Plaintiff estimates that "40% of [his] clients first contact [his business] as the direct result of visiting . . . ABQHomes.com."  (*Id.*)

 Plaintiff has invested $70,000 "advertising and promoting the ABQHOMES mark."  (S. Creek Decl. ¶2.)  Since 1999, for example, the Creeks have advertised on KUNM, in a radio spot that prominently mentions ABQHOMES.  (F. Creek Decl. ¶9; *id.* Ex. H (script read on KUNM).)  The ad is broadcast during KUNM's "Morning Edition," the "highest rated radio program in Albuquerque."  (F. Creek Decl. ¶9 ("Morning Edition" on KUNM reaches "over 40,000 listeners each morning").)

 Plaintiff avers that Defendant (Victor Rodriguez, a sole proprietor) unlawfully appropriated,

and continues to use, the ABQHOMES mark.  Plaintiff alleges that Defendant's use of the mark

"ABQHOMES," "to identify [Defendant's] real estate brokerage business in the same market" in

which Plaintiff operates his real estate brokerage business, constitutes "trade name and service mark

infringement, unfair competition, and unfair and deceptive trade practices."  (Am. Compl. 1.)  He

seeks an order of this Court enjoining Defendant's use of the mark.

### B.      Defendant and Defendant's contentions.

Defendant (Victor Rodriguez, a sole proprietor) "is a licensed real estate broker who has

conducted business in Albuquerque, New Mexico since approximately May 2003." (V. Rodriguez

Aff. ¶1.)  Rachel Rodriguez, Defendant's wife and business partner, is a licensed real estate broker.

(*Id*.; R. Rodriguez Aff. ¶1.)  She has "conducted business in Albuquerque, New Mexico since

approximately September 2001."  (R. Rodriguez Aff. ¶1.)  Defendant and his wife operate their

business under the trade name "ABQ Homes"; Defendant is the business's qualifying broker.  (V.

Rodriguez Aff. ¶3); *see* http://abqhomes.tv.

Defendant states that he "registered the term 'ABQ Homes' as a trade name for his real estate

business" under the New Mexico Real Estate Commission's rules "on or about November 29, 2006."

(V. Rodriguez Aff. ¶3 (emphasis added); *but see* Pl.'s Reply Ex. 2 at 6 (letter from Commission's

Executive Secretary of June 4, 2007) (denying that the Commission "granted [Defendant's] use of

the trade name because it no longer possessed the regulatory authority to do so").)  At that time, he

"began using the term 'ABQ Homes'" as the trade name for his Albuquerque, New Mexico real estate

business.  (Answer ¶29; V. Rodriguez Aff. ¶4.)  Defendant states that, "[p]rior to registering the

term," he "inquired with the Commission to confirm that the trade name 'ABQ Homes' was not

already being used by another real estate brokerage."  (V. Rodriguez Aff. ¶5.)  He maintains that he

4

had "no actual notice of [Plaintiff's] claimed use of the term [ABQHOMES] prior to approximately

March 8, 2007" - i.e., the date he received a cease and desist letter from Plaintiff's counsel:

> Neither Mr. Rodriguez nor Ms. Rodriguez recall having heard of Mr. Creek or his
> wife until this dispute arose between the parties concerning use of term "ABQ
> Homes." During the course of his career, Mr. Rodriguez does not recall visiting any
> home listed for sale by Mr. Creek. Mr. Rodriguez does not listen to KUNM. Mr.
> Rodriguez searches the Internet to view real estate. Specifically, he uses Realtor.com,
> the Southwest MLS website and the National Association of Realtors website.
> Because Mr. Creek did not disclose his use of the term "ABQHOMES" on any of
> these sources, Mr. Rodriguez had no actual notice of Mr. Creek's claimed use of the
> term prior to approximately March 8, 2007.

(Def.'s Resp. 2-3; Countercl. 7; V. Rodriguez Aff. ¶¶7-11; R. Rodriguez Aff. ¶¶3-4.)

Defendant "disputes [Plaintiff's] alleged trademark rights in the term" ABQHOMES. (Pl.'s

Reply Ex. 2 at 2; V. Rodriguez Aff. ¶¶13-17.) As grounds, Defendant contends that, because the

mark is simply geographically descriptive, it is not protectable. For this reason, he also maintains that

the New Mexico Secretary of State improperly approved Plaintiff's registration of ABQHOMES in

1999. (Def.'s Resp. 7-8 (citing N.M. Stat. Ann. § 57-3B-4(A)(5)(b) and arguing that the mark is

"subject to cancellation" under state law).) Defendant counterclaims for an "order of this Court

requiring [Plaintiff] to request cancellation of the trademark from the New Mexico Secretary of

State." (Countercl. 8.)

> **C.   New Mexico Real Estate Commission Complaint: Defendant's arguments that
> ABQHOMES is not protectable because Plaintiff did not register the mark with
> the Commission are without merit.**

On May 1, 2007, Defendant, through counsel, formally requested that the New Mexico Real

Estate Commission ("the Commission") "initiate an investigation and administrative proceedings

against," *inter alios*, Plaintiff for marketing "real estate . . . in a manner that creates a danger of

misleading the public and violates the Commission's regulations." (Pl.'s Reply Exs. 2, 4.) Therein,

Defendant alleged that Plaintiff violated the New Mexico Administrative Code by, *inter alia*, failing to have a "qualifying broker" register the trade name "ABQhomes" with the Commission "prior to the operation of a brokerage using the trade name."[1]  (*Id*. at 2-3.)  Defendant stated that on or about November 29, 2006 when he inquired about registering the trade name "ABQ Homes" with the Commission: (1) he was informed by the Commission that the trade name was not registered to another real estate brokerage; and (2) the Commission "granted" Defendant's requested registration. (V. Rodriguez Aff. ¶¶3, 5; Pl.'s Reply Ex. 2 at 2.)

On June 4, 2007, however, the Commission's Executive Secretary notified defense counsel that he would recommend to the Commission "that it close [Defendant's] complaint with no further action based on a finding of *no violations*" of  Commission Rules.[2]  (Pl.'s Reply Ex. 2 at 6.)

Simply put, Plaintiff was not obligated to register a trade name with the Commission.  The Executive Secretary explained that:

> The requirement to register a trade name with the Commission prior to doing business under that trade name is a *qualifying broker requirement*.  Given the fact that [Plaintiff] is an *associate* broker, his web site appears to comply with what is required of associate brokers when advertising real estate.

(*Id*. 6 (emphasis added)); *see generally* N.M. Stat. Ann. § 61-29-2 (defining "associate broker" and "qualifying broker").  Notably, where an "investigation reveals that [a] complaint does not involve a violation of the Real Estate License Law or the [C]ommission rules, the complaint will be dismissed

---

[1]Defendant also alleged that Plaintiff - after the instant dispute arose - "changed the appearance of his website to more closely resemble the trade name registered by [Defendant]."  (Pl.'s Reply Ex. 2 at 3. ("[Plaintiff] removed '.com' from the logo at the top of his homepage.").)  Defendant argues that such advertisement practices "demonstrate[] [Plaintiff's] . . . willingness to mislead the public."  (*Id*.)

[2]Pursuant to the Commission's practices, the Executive Secretary, together with the Commission's Chief Investigator, must approve investigative reports before they are presented to the Commission.  (Def.'s Hr'g Ex. A at 1.)  The Commission decides whether "a violation of the law or [Commission] rules has occurred" based on these investigative reports.  (*Id*.); *accord* N.M. Code R. § 16.61.36.8 (Weil 2007).

by the commission." N.M. Code R. § 16.61.36.9 (Weil 2007). Therefore, Defendant's contentions related to Plaintiff's alleged violation of Commission rules are apparently without merit and need not be taken up further here.

One more aspect of the Executive Secretary's June 4, 2007 letter that warrants mention is related to Defendant's contention that he had "registered" the trade name "ABQ Homes" with the Commission. The Executive Secretary noted that Defendant could not have "registered" the trade name with the Commission in November 2006:

> Effective January 1, 2002, the Commission ceased granting approval of real estate brokerage trade names. Therefore, while [Defendant] may have inquired with the Commission on [sic] November 2006 about whether "ABQ Homes" was in use by another real estate brokerage and may have been told that it was not in use, the Commission would not have granted [such use] . . . because it *no longer possessed the regulatory authority to do so*.[3]

(Pl.'s Reply Ex. 2 at 6 (emphasis added).)

In light of these submissions, the Court finds that - for present purposes - Defendant's position that Plaintiff has not lawfully used the mark ABQHOMES, by failing to register the mark, appear to be without merit.[4] As such, the Court need not, and will not, further consider Defendant's

---

[3]At the June 7, 2007 motion hearing, Defendant introduced a letter Defendant received from the Commission's Administrative Secretary dated June 6, 2007. (Def.'s Hr'g Ex. A.) The letter acknowledges the Commission's receipt of Defendant's complaint, identifies the investigator assigned to the case, and details the process the Commission "follow[s] with every complaint." (*Id.*); N.M. Code R. § 16.61.36.8 (indicating every complaint filed is assigned an investigator, once the Commission confirms it has jurisdiction over the matter). Simply stated, it appears to be a form letter. As such, the Court does not find that the June 8, 2007 letter detracts from the significance of the Executive Secretary's letter of June 4, 2007 letter. *See supra* note 2 (discussing gate-keeping role of the Executive Secretary).

[4]The Court's instant ruling is based on the parties' proffers, which - however necessary - have obvious limits (e.g., the Court is unable to observe witnesses and otherwise assess their credibility). Hence, nothing in the Court's ruling - which, of course, is based solely on the record *as it stands today* - is, or should be otherwise understood to be, factual findings. In passing on the parties' presentations, the Court does so solely for preliminary injunction purposes. *See generally Sole v. Wyner*, 127 S. Ct. 2188, 2195 (2007) ("the provisional relief granted [by the district court in the form of a preliminary injunction] terminated only the parties' opening engagement").

claims that Plaintiff does not have protectable right in the mark ABQHOMES on this basis.

## II.   Discussion.

### A.   Preliminary Injunction Standard.

The Court of Appeals for the Tenth Circuit provides clear guidance regarding motions for

preliminary injunction:

> To prevail on a motion for a preliminary injunction in the district court, a moving party must establish that:
>
> > (1) he or she will suffer irreparable injury unless the injunction issues; (2) the threatened injury ... outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood of success on the merits.
>
> But because a preliminary injunction is an extraordinary remedy and is intended merely to *preserve the relative positions of the parties* until a trial on the merits can be held, we have held that the moving party must meet a heightened standard when requesting one of three types of historically disfavored injunctions.
>
> > The three types of disfavored injunctions are (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.  When a preliminary injunction falls into one of these categories, it must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.  A district court may not grant a preliminary injunction unless the moving party makes a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms.

*Summum v. Pleasant Grove City*, 483 F.3d 1044, 1048-49 (10th Cir. 2007) (emphasis added)

(internal brackets, quotation marks, and citations omitted); *GTE Corp. v. Williams*, 731 F.2d 676,

679 (10th Cir. 1984) ("The burden on the party seeking a preliminary injunction is especially heavy

when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain

after a trial on the merits. The injunction will issue.").

8

First, an injunction here would alter the status quo. "An injunction alters the status quo when it changes the last peaceable uncontested status existing between the parties before the dispute developed." *Id.* (internal quotation marks and citation omitted). The last uncontested status existing between Plaintiff and Defendant was "no relationship between the parties"; an injunction enjoining Defendant from using ABQ Homes in his business would, therefore, "clearly change[] the status quo." *Id.* Second, the injunctive relief sought by Plaintiff here would be mandatory, as it would "affirmatively require" Defendant "to act in a particular way" (i.e., to change the name of his business and, therein, his web page address, advertisements, other promotional materials, etc.).

Therefore, the preliminary injunction sought by Plaintiff "clearly falls within two categories of disfavored injunctions: it alters the status quo and is mandatory."[5] *Id.* at 1048. As such, Plaintiff must make "a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms to prevail on its motion." *Id.* (internal quotations and citations omitted).

**B.     Plaintiff has made the requisite showing; the injunction will issue.**

Plaintiff has made the exacting, requisite showing as to all four preliminary-injunction elements.[6] *See eBay, Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837, 1839 (2006).

**1.     Substantial likelihood of success on the merits.**

To establish a substantial likelihood of success on the merits, ordinarily, it is sufficient for the plaintiff to "raise[] questions going to the merits" that are "serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Hartford*

---

[5]Plaintiff maintains that the "injunction will preserve the *status quo ante*." (Pl.'s Reply 12.)

[6]*See supra* note 4.

*House Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1271 n.2 (10th Cir. 1998) (internal quotation marks and citation omitted).  Plaintiff's Amended Complaint asserts that Defendant violated: (1) Lanham Act, 15 U.S.C. §§ 1125, 1114, Trademark Infringement and Unfair Competition; (2) his common law trade name and service mark law rights; and (3) New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. § 57-12-2.  (Am. Compl. 6-8.)  All three causes of action pertain to Plaintiff's ABQHOMES mark.  Because the Court finds that Plaintiff has demonstrated a substantial likelihood of success on his Lanham Act claims, it is not necessary to address Plaintiff's remaining two claims.

Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125, "protects against service mark infringement even if the mark has not been federally registered." *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1215 (10th Cir. 2004) (internal quotation marks and citation omitted).  To prevail in an action under § 43(a) for either infringement or unfair competition, a "plaintiff must establish that (1) her mark is protectable, and (2) the defendant's use of [an identical or similar] mark is likely to cause confusion among consumers."[7]  *Id.*; *see Audi AG v. D'Amato*, 469 F.3d 534, 543 (6th Cir. 2006) (Lanham Act infringement and unfair competition claims are premised on "the same test" - i.e., "the likelihood of confusion between the two marks" (citing *Two Pesos v. Taco Cabana*, 505 U.S. 763, 780 (1992))).

### a.      Whether ABQHOMES is protectable.

Under federal law, a service mark includes:

---

[7]"The Lanham Act provides that one party infringes another's []mark when it uses a similar mark *in commerce* and such use is likely to cause confusion." *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 833-34 (10th Cir. 2005) (internal quotation marks omitted) (citing 15 U.S.C. § 1114).  It is uncontested that Defendant has used the ABQ Homes mark in commerce.  Defendant argues, however, that Plaintiff cannot satisfy this requirement because Plaintiff has not *lawfully* used ABQHOMES in commerce.  (Def. Resp. 7.)  As previously stated, Defendant's claims related to Plaintiff's alleged violations of New Mexico Real Estate Commission rules are without merit.  *See supra* Part I.C. (noting Defendant's claims related to the Commission are without merit).

"any word ... or any combination thereof ... used by a person ... to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127.  To be protectable, a mark must be capable of distinguishing the products [or services] it marks from those of others.  There are five different categories of terms with respect to the protection of a mark: generic, descriptive, suggestive, arbitrary, and fanciful . . . .

. . . .

These categories reflect both the *eligibility* for protection and the *degree* of protection accorded a particular mark.

*Donchez*, 392 F.3d at 1215 (additional quotations and citations omitted) (emphasis added).

It is uncontested that ABQHOMES is a descriptive mark.  (Pl.'s Mem. in Supp. Mot. Prelim. Inj. 9; Def.'s Resp. 4.)  "A mark is descriptive if it describes the product's [or service's] features, qualities, or ingredients in ordinary language or describes the use to which the product [or service] is put."  *Donchez*, 392 F.3d at 1215.  Notably, only descriptive marks that have "acquired a 'secondary meaning' in the minds of the public" are "eligible for protection."  *Id.*; *see generally Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 785 n.3 (8th Cir. 1995) ("Secondary meaning is sometimes referred to as "acquired distinctiveness," and is established when "the user of ... a [trade] dress [has shown] that by long and exclusive use in the sale of the user's goods, the [dress] has become so associated in the public mind with such goods that the [dress] serves to identify the source of the goods and to distinguish them from those of others." (internal quotation marks and citation omitted)).

"Secondary meaning exists only if most consumers have come to think of the word as not descriptive at all but as the name of the product [or service]."  *Donchez*, 392 F.3d at 1215.  To demonstrate secondary meaning, a plaintiff may use:

direct evidence, such as consumer surveys or testimony from consumers.  A plaintiff may also establish secondary meaning for a name by presenting circumstantial evidence regarding: (1) the length and manner of its use, (2) the nature and extent of

advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture.

*Id*. at 1218 (internal quotation marks and citations omitted).   Whether a mark "has acquired secondary meaning is a question of fact."  *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002).

Plaintiff has established, for present purposes, that ABQHOMES has secondary meaning. First, Plaintiff's nine years' of "substantially exclusive and continuous use" is probative evidence that ABQHOMES has attained "secondary meaning."[8] *Stuart Hall Co.*, 51 F.3d at 789.  The Lanham Act provides that:

> The [U.S. Patent and Trademark Office ("USPTO")] Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of *substantially exclusive and continuous use* thereof as a mark by the applicant in commerce for the *five years* before the date on which the claim of distinctiveness is made.

---

[8]To be clear, registering a mark on the Supplemental Register "creates no substantive rights," but does afford the registree the following benefits:

> (1) Supplemental Registration allows the owner of the registered mark to bring suit for infringement in federal court and federal law will govern the case.
> (2) The Supplemental Registration can be used by a PTO Examiner to cite ex parte against future applications of confusingly similar marks for registration on either the Principal or Supplemental Register.
> (3) The mark appears on the federal Supplemental Register, is easy to find by others and will appear in the future on search reports conducted by others who are seeking clearance to use similar marks. The mere presence of the mark on the Supplemental Register may deter others from using confusingly similar marks.
> (4) The owner of a mark on the Supplemental Register is legally entitled to use the R in a circle symbol of federal registration.
> (5) A mark accepted for Supplemental Registration is not subject to challenge by an Opposition proceeding.  But it may be challenged in a Cancellation proceeding by those who will be damaged by registration of the mark.
> One minor benefit of a Supplemental Registration is that suit for infringement of the registered mark can be brought in federal court, along with a related claim of unfair competition .
> . . . questions of validity, ownership and infringement of Supplemental Registrations are governed by federal law.

3 McCarthy § 19:37 (citations and notes omitted).

15 U.S.C. § 1052(f) (emphasis added).  The Act's presumption "is relevant to the instant case." *Sunbeam Prods. Inc. v. West Bend Co.*, 123 F.3d 246, 255 (5th Cir. 1997), *overruled in part on other grounds sub nom. TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001); *Stuart Hall Co.*, 51 F.3d at 789 ("Stuart Hall's exclusive and continuous use of its trade dress for the period of time that creates a statutory presumption of secondary meaning for trademark registration weighs in favor of a finding of secondary meaning, and the district court, on remand, should consider this factor in addition to the other factors bearing on secondary meaning."); *accord* J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 15:62 (4th ed. 1996) ("The five-year presumption for registration may be used by analogy as probative evidence of secondary meaning *in litigation* attempting to establish unregistered" rights in a mark." (emphasis added)) [hereinafter "McCarthy"].   "[A]t a minimum," the fact Plaintiff satisfied § 1052(f)'s five-year presumption "weighs in [his] favor."  *E.g.*, *Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*, 301 F. Supp. 2d 901, 910 (W.D. Wis. 2003).

Second, and even more significant here, is Plaintiff's substantial showing that he has vigorously, extensively, and consistently advertised ABQHOMES over the past nine years.  The "nature and extent of advertising and promotion" of ABQHOMES is significant evidence of the mark's strength and that it has attained secondary meaning.  *Donchez*, 392 F.3d at 1218. Plaintiff's proffers demonstrate that it has widely and consistently featured ABQHOMES in high-profile advertisements in Albuquerque.  (*E.g.*, F. Creek Decl. ¶9 (noting that Plaintiff's ads on KUNM-FM have, since 1999, broadcast during a program that has 40,000 listeners and prominently mention ABQHOMES).)  In addition, since adopting it, the Creeks have used the mark on their property

signs, property contracts, as well as placing it prominently on each page of their web site, ABQHomes.com.

Third, and relatedly, Plaintiff's aforementioned promotional efforts have cultivated "a conscious connection, in the public's mind," between ABQHOMES and the Creek's real estate business.  *See Donchez*, 392 F.3d at 1218.  They have accomplished this by consistently and frequently mentioning the mark in conjunction with Plaintiff and his wife's real estate services.  These efforts' import is further amplified when taken together with the Plaintiff's market prominence, "significant" real estate sales, large customer base, and the name recognition that the Creeks enjoy today.

Defendant's contentions to the contrary are unpersuasive.  He first argues that Plaintiff's duration of use is immaterial given that ABQHOMES's geographic descriptiveness precludes Plaintiff having protectable rights in the mark.  (Def. Resp. 4.)  Defendant states that "ABQ" is "generally recognized as an abbreviation for the city of 'Albuquerque, New Mexico'" and, therefore, when ABQHOMES is  "used in connection with Mr. Creek's real estate services [it] is primarily geographically descriptive."  (Answer 8; R. Rodriguez Aff. ¶5.)  Accordingly, he claims that "it is understood among consumers and professionals in this locality that the term 'ABQ Homes' merely describes real estate located in Albuquerque, New Mexico."[9]  (V. Rodriguez Aff. ¶16.)

Defendant's position fails to recognize Plaintiff's aforementioned considerable investment in,

---

[9]Defendant underscores that, in 2003, the USPTO rejected Plaintiff's request to register ABQHOMES on the Principal Register "due to geographic descriptiveness." (Pl.'s Reply 3; Def. Resp. Ex. 15 (USPTO document noting that Plaintiff's Principal Resister application was rejected "due to geographic descriptiveness").)  The Court does not find that this precludes it from finding that the mark has achieved secondary meaning here.  Notably, when Plaintiff submitted his application in 2002 his use did not qualify for § 1052(f)'s presumption because he had not yet used it for five years.  In any case, this issue is before the Court in 2007: five additional years have passed since the USPTO's decision, which is significant given Plaintiff's continuous use, and  substantial promotional efforts, of the ABQHOMES mark since 2002.  (*E.g.*, Pl.'s Reply Ex. 3 (KUNM-FM advertising).)

and consistent promotion of, ABQHOMES and his real estate business.  As such, while "ABQ" can stand for Albuquerque, Plaintiff's proffer evidences that ABQHOMES has become associated, in the public's minds, with his real estate business.  (Pl.'s Reply Ex. 3 (Aff. from KUNM representative)); *cf. FS Servs., Inc. v. Custom Farm Servs., Inc.*, 471 F.2d 671, 673-74 (7th Cir. 1972) (district court did not err in finding no secondary meaning in the "the letters FS . . . where they are used without [the plaintiff's logo]," where "'farm supply' and 'farm services' are not uncommon nor unusual generic descriptive terms" where the parties are both in business, and where "plaintiff's own member companies operate under individual designations which variously employ 'farm service,' 'service,' 'farm supply' or 'supply' in their titles").

Likewise, Defendant's position that Plaintiff's use of ABQHOMES has *not* been exclusive "among those who advertise and market real estate services online in Albuquerque, New Mexico" is unavailing.  (V. Rodriguez Aff. ¶14.)  Defendant points to the following Internet addresses: (1) "www.homes-abq.com"; (2) "www.albuquerquehomes.com"; (3) "www.albuquerquehomes.net"; (4) "www.abqhomes.info"; (5) "www.albqhomes.com"; (6) "www.abq-homes.com."  Further, he notes multiple sites that "contain slight variations of the term 'ABQHOMES'" - e.g., at "www.nmabqhomes.com," "www.myabqhome.com," "www.abqhomestore.com," "www.abqhomesearch.com," "www.albuquerquehomesforless.com," and "www.abqhomefinder.com." (Def. Resp. 6; V. Rodriguez Aff. ¶17.)  But - unlike Defendant's mark - these  web pages are *not* identical to Plaintiff's mark when spoken, nor the real estate agents who own those sites use "ABQHOMES" as their trade name.  (Pl.'s Reply 4 ("ABQHOMES is pronounced A-B-Q homes, not "Albuquerque")).  And, while several of the sites are "close variations of ABQHomes.com" when written, Plaintiff proffered that - unlike his web page - these sites do not

have a significant "web presence" (i.e., they do not appear high on GOOGLE or YAHOO search result lists), nor have they been "widely advertised." (*See id*.; *e.g.*, Second F. Creek Decl. ¶5.)  Based on the parties' representations, these web pages constitute "inconsequential" use of the mark and, thus, do not preclude Plaintiff's "declaration of 'substantially exclusive' use." *See L.D. Kichler Co. v. Davoil, Inc*., 192 F.3d 1349, 1352 (Fed. Cir. 1999) (emphasis added) (quoting 15 U.S.C. § 1052(f)); *Unique Sports Prods., Inc. v. Babolat VS*, 403 F. Supp. 2d 1229, 1239 (N.D. Ga. 2005) (same).

The Court finds, therefore, that Plaintiff's showing - producing evidence of all three types of relevant circumstantial evidence - sufficiently demonstrated that ABQHOMES has secondary meaning and, therefore, that the mark is protectable.  *Donchez*, 392 F.3d at 1215.

> **b.    Whether Defendant's use of ABQ Homes, a mark similar to ABQHOMES, is likely to cause confusion among consumers.**

"In determining whether a likelihood of confusion exists between two marks," the Tenth Circuit considers six "nonexhaustive factors":

> (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks.

*Sally Beauty Co.*, 304 F.3d at 972.

As to the similarity of the marks at issue:

> The degree of similarity between marks rests on sight, sound, and meaning. *Id.* This court must determine whether the allegedly infringing mark will confuse the public when singly presented, rather than when presented side by side with the protected trademark. *Id.* In so doing, similarities are weighed more heavily than differences, particularly when the competing marks are used in virtually identical products packaged in a similar manner . . . .

*Id.* Here, ABQHOMES and ABQ HOMES are *identical* when spoken.  *Cf. id.* (finding it significant in similarity argument that the "sound of the marks is . . . different").  Aside from the fact Defendant's mark has a space between "ABQ" and "homes," while Plaintiff's does not, they are identical by sight, as well.  This factor weighs heavily in Plaintiff's favor.

> As to Defendant's intent in adopting the ABQ Homes mark:

> Proof that a defendant chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion.  The proper focus under this factor is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff.  One who adopts a mark similar to another already established in the marketplace does so at his peril, because the court presumes that he can accomplish his purpose: that is, that the public will be deceived. All doubts must be resolved against him

*Sally Beauty Co.*, 304 F.3d at 972.  Defendant's protestations of ignorance as to the ABQHOMES mark and "ABQHomes.com" when he adopted ABQ Homes appear disingenuous.

While Defendant maintains that he first became aware of the ABQHOMES mark when this dispute arose in March 2007, his claims' veracity is questionable given: (1) how prominently Plaintiff has promoted the mark and that ABQHomes.com consistently appears at the top of common Internet-based search results for terms related to Albuquerque residential real estate; (2) that, although Defendant's wife and business partner Rachel Rodriguez denies awareness of the Creeks or ABQHomes.com prior to the time the instant dispute arose, like Plaintiff, she worked for Coldwell Banker Legacy between 2001 and 2003; and (3) that Defendant's web page - abqhomes.tv - has a ".tv" Internet suffix.[10]  In any case, because Defendant's intent in adopting ABQ Homes is, at best,

---

[10]Notably, the Internet suffix ".tv" was originally assigned to, and owned by, the sovereign nation of Tuvalu.  *See* BBC News, Country Profile: Tuvalu, http://news.bbc.co.uk/1/hi/world/asia-pacific/country_ profiles/1249549.stm (recognizing that Tuvalu is a sovereign nation of nine islands in the South Pacific).  While Tuvalu sold its rights to the ".tv" suffix to a private company in 2000, and today domain names with the .tv suffix can be purchased from a number of private companies, they remain uncommon.  *See* http://www.tv/contact-us/registrars.php (listing "Certified .tv Registrars," including "GoDaddy.com"); Adam

questionable, this factor weighs in Plaintiff's favor.

As to proof of actual confusion, the Tenth Circuit has explained that:

> Although not necessary to prevail on a trademark infringement claim, evidence of actual confusion in the marketplace may be the best indication of likelihood of confusion.  Such evidence may be introduced through surveys, although their evidentiary value depends on the methodology and questions asked. Evidence of actual confusion does not create a genuine issue of fact regarding likelihood of confusion if it is *de minimis*.

*Id*. at 974.  Plaintiff proffered that three customers have been "actually confused" by Defendant's ABQ Homes mark.  (S. Creek Decl. ¶8 (two discreet incidents of actual client confusion cited); *see* Hr'g Transcript (one, additional incident of actual client confusion cited since Plaintiff filed Motion for Preliminary Injunction).)  Without more, this de minimis evidence does not justify a finding of confusion per se.  Nonetheless, such evidence of consumer confusion weighs in Plaintiff's favor.  *Id*.

The similarity of the parties' respective products and manner of marketing is the next factor related to making a confusion determination.  *See id*.  These issues are analyzed separately.  *Id.*  "The greater the similarity between the products . . .the greater the likelihood of confusion." *Id.* (internal quotation marks and citation omitted).  This factor weighs heavily in Plaintiff's favor.

"In analyzing the similarity in the manner of marketing," the Ten Circuit considers "whether the parties were competitors in consumer markets."  *Id.*  It is uncontested that the parties are direct competitors in the Albuquerque residential real estate market.  Customers interested in residential real

---

Lashinsky, *Dot-tv Gets a Second Chance at Life*, Fortune, Dec. 12, 2006, *available at* http://money.cnn.com/2006/12/12/technology/pluggedin_lashinsky.fortune/index.htm.  Hence, Defendant's claim that he was unaware of the ABQHOMES mark or "ABQHomes.com" address when he began using the mark ABQ Homes is disingenuous. The fact Defendant acquired a ".tv" domain name for his "abqhomes.tv" site evidences this.  At least at this time, seeking a domain name with a ".tv" Internet suffix- and even knowing that ".tv" addresses are available - requires a certain level of sophistication that is inconsistent with his claim that he was not aware of ABQHomes.com.  Even an unsophisticated Internet user can quickly stumble upon ABQHomes.com when typing "abq" or "albuquerque" and "homes" or "real estate" into a major Internet search engine.

estate in Albuquerque would be, at least hypothetically, interested in both Plaintiff and Defendant's services. Additionally, graphically - at least on the parties' respective signs placed outside of listed properties - the marks are strikingly similar. (*See* Pl.'s Hr'g Exs. 2, 3.) For example, both parties' property signs: (1) feature the letters "ABQ" in all capital letters; (2) are printed in white letters on a red rectangular background; (3) appear on the bottom of the parties' respective property signs. (*Id.*)

Further, both Plaintiff and Defendant use the Internet to market their services.[11]  This also weighs very heavily in Plaintiff's favor because, as the Court of Appeals for the Sixth Circuit recently stated:

> Simultaneous use of the Internet as a marketing tool exacerbates the likelihood of confusion, given the fact that entering a web site takes little effort-usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership.

*Audi AG*, 469 F.3d at 543 (internal brackets, quotation marks, and citation omitted); *see also Australian Gold, Inc v. Hatfield*, 436 F.3d 1228, 1238-39 (10th Cir. 2006) (recognizing "initial interest confusion" in the Internet context); *see infra* Part II.B.2. (discussing the *Australian Gold, Inc.* decision in the "irreparable injury" context).  And while it is unclear how much Internet-based business Defendant obtains through his "abqhomes.tv" web page, the Internet is clearly important to Plaintiff's business.  (F. Creek Decl. ¶¶5-7 ("40% of [Plaintiff's] clients first contact [his business] as the direct result of visiting . . . ABQHomes.com.").)  This factor weighs heavily in Plaintiff's favor.

---

[11]The risk of confusion is corroborated by the fact that, in typing the phrase "abqhomes" into GOOGLE on June 13, 2007, the first three results were to Plaintiff's "ABQHomes.com" site; the fifth search result was Defendant's web page.

As to the degree of care exercised by the consumer, the Court of Appeals explains that:

> A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusion.  This court has explained that buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse.  Accordingly, items purchased on impulse are more likely to be confused than expensive items, which are typically chosen carefully.  The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase.

*Id.* at 975.  Purchasing real estate is, almost universally, a hugely significant decision.  Consumers presumably use a great deal of care before making such a purchase, especially compared to inexpensive "items."  *Cf. id.* (hair care products).  This factor weighs in Defendant's favor.

Finally, the Court must assess the strength of Plaintiff's mark: "The stronger the mark, the greater the likelihood that encroachment on the mark will cause confusion."  *Id.* (internal quotation marks and citation omitted).  As discussed above, Plaintiff has demonstrated that ABQHOMES has developed secondary meaning.  Particularly significant is Plaintiff's nine-years of use, *cf. id.* at 978 n.4 (to demonstrate secondary meaning, evidence of a plaintiff's long-time use of mark must be "so long and so *exclusively* by one producer with reference to his goods that it [shows the mark] has acquired distinctiveness"), consistent styling and presentation of the mark, and continuous and significant promotion of ABQHOMES.  Also relevant to this inquiry, is the fact Plaintiff enjoys an established place - and, therein, name-recognition - in the Albuquerque real estate market.  *Cf. id.* at 978 ("Standing alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification.").

Defendant reasserts his arguments - regarding ABQHOMES being "merely geographically descriptive of homes located in Albuquerque, New Mexico" and the existence of other real estate sites having similar Internet addresses - in attempting to undermine Plaintiff's position that consumer

confusion will not result from Defendant's continued use of ABQ Homes.  But, for the same reasons addressed above, Defendant fails to address the obvious: ABQHOMES mark has attained - through Plaintiff's nine-years' use and aforementioned promotional efforts - secondary meaning and, thus, the likelihood of confusion is significant.  Thus, the Court finds that Defendant's proffer fails to rebut Plaintiff's showing that a clear, evident likelihood of confusion is attendant to Defendant's use of ABQ Homes.

The Court finds that Plaintiff demonstrated that ABQHOMES is a protectable mark, that Plaintiff has used it in commerce, and that it is very likely that confusion will result from Defendant's continued use of ABQ Homes.  Accordingly, Plaintiff made a "strong showing" that his Lanham Act claims stand a "substantial likelihood of success on the merits."  *See Summum*, 483 F.3d at 1048.

### 2.      Irreparable injury absent the injunction issuing.

Whether Plaintiff "will suffer irreparable harm if denied an injunction" requires careful analysis of the facts at bar.  *Summum*, 483 F.3d at 1055; *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) ("showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction" (internal quotation marks and citation omitted)).  The Tenth Circuit has explained that, generally, "[t]o constitute irreparable harm":

> an injury must be certain, great, actual and not theoretical.  Merely serious or substantial harm is not irreparable harm.  The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.  It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages.

*Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (internal quotation marks, brackets,

and citations omitted).  A "plaintiff suffers irreparable injury when the court would be unable to grant

an effective monetary remedy after a full trial because such damages would be inadequate or difficult

to ascertain." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citation omitted).

Notably, "[i]rreparable injury is frequently *presumed* where a []mark is wrongfully

appropriated by another." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1100-01 (10th Cir.

1991) (emphasis added), *overruled on other grounds by O Centro Espirita Beneficente Uniao Do

Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), *and quoted in Lorillard Tobacco

Co. v. Engida*, 213 F. App'x 654, 656-57 (10th Cir. 2007).

> "[T]rademark infringement 'by its very nature' results in irreparable harm to the
> owner of the mark." *Amoco Oil Co. v. Rainbow Snow, Inc.*, 809 F.2d 656, 663 (10th
> Cir. 1987); *see Packerware Corp. v. Corning Consumer Prods. Co.*, 895 F. Supp.
> 1438, 1452 (D. Kan. 1995) ("Because a trademark represents intangible assets, such
> as reputation and goodwill, irreparable injury will be presumed upon a showing of
> trademark infringement.").  In trademark cases, *confusing similarity between the
> trademarks is sufficient injury* to warrant the issuance of a preliminary injunction.  A
> movant who has established a likelihood of confusion is not required to show that it
> lost sales or incurred other damage.

*Pimentel & Sons Guitar Makers, Inc. v. Pimentel*, No. CV 04-0360 JB/RLP, 2005 WL 3664269, at

*5 (D.N.M. Oct. 12, 2005) (additional brackets, quotation marks, and citations omitted).  Two

exceptions to this "presumption of irreparable harm in trademark cases" exist.  Notwithstanding

trademark infringement, irreparable injury will not be presumed where: (i) a trademark "is already

weak"; or (ii) where Plaintiff delays in seeking injunctive relief.  *Id.* (citations omitted).

Here, neither exception applies.  As to the first exception:

> The presumption of irreparable injury is undermined when the trademark in question
> is already weak.  In *Amoco Oil Co. v. Rainbow Snow, Inc.*, for example, the Tenth
> Circuit determined that the district court did not abuse its discretion when  it found
> that plaintiff's trademark bearing a rainbow was weak when at least 35 businesses in
> the relevant metropolitan area used multi-colored rainbows to advertise.  In that case,

the district court denied the injunction, reasoning that the defendant's continued use of the trademark would have a negligible effect during the pendency of the action. In denying injunctive relief, the Amoco [c]ourt supported its position by pointing out that the purpose of an injunction is merely "to preserve the status quo pending a final determination of the parties' rights."

*Id*. (quoting *Amoco Oil Co.*, 809 F.2d at 664) (additional citations omitted). Defendant suggests that Plaintiff's ABQHOMES mark is weak because: (1) Plaintiff's "use of the term has not been exclusive among those who advertise and market real estate services online in Albuquerque, New Mexico"; (2) even Defendant - a licensed real estate agent - did not become aware of the ABQHOMES mark before the instant dispute arose, despite searching Realtor.com, Southwest MLS's website, and the National Association of Realtors website.[12]  (Def. Resp. 2-3.)

Plaintiff rebuts these contentions. First, Plaintiff underscored that his site, ABQHomes.com, "is sometimes first and always in the top 3 of the first page of ["GOOGLE or YAHOO"] results listed in both these major search engines." (Second F. Creek Dec. ¶4.) In contrast, the "two websites that are close variations on "ABQHomes" are "not visited often and have no web presence."[13]  (Pl.'s Reply (citing Decl. F. Creek ¶ 3).) Second, Plaintiff disputes Defendant's claim that his research did

---

[12]To be clear, Defendant disputes that Plaintiff has *any* "trademark rights in the term" ABQhomes. (Pl.'s Reply Ex. 2 at 2.)

[13]Plaintiff submits that "Internet presence" hinges on "where a site appears on the results list on the major search engines":

> If a site isn't high on the results list or at least on the first page, it is rarely seen or visited by one searching the term. *Id*. None of the addresses listed by Rodriguez pops up high on the list or even on the first page of GOOGLE or YAHOO in the two most widely used searches for real estate in this area, "Albuquerque Homes for Sale" and "Albuquerque Real Estate." *Id*. Creek's site, ABQHomes.com, is sometimes first and always in the top three on the first page of these results list. *Id*. No site defendant lists has been widely advertised, and none of them appear in the business pages of the phone book. Plaintiff . . . monitors the Internet and major search engine top results on an almost daily basis [but was, nevertheless] . . . unaware of these sites until defendant noted them [in his Response]. Neither was prominent, well informed, and highly respected broker Peter Parnegg [aware of the sites prior to Defendant's Response].

(*Id*.)

not reveal the ABQHomes.com site:

> [N]o one can view real estate on the National Association of Realtors® website, Realtor.org., which is a private website and is a source of information for realtors, not a source to view listings.  Therefore, Mr. Rodriguez only "searched the Internet to view real estate" at two web sites: Realtor.com and the Southwest MLS website.  Contrary to his statements, both sites display and have displayed listings prominently advertising ABQHOMES®.   All the Creeks' listings on Realtor.com advertise ABQHOMES®.  Specifically, there is a *scroll* across the middle of the screen that says: "Call Fred Creek at 480-FRED (3733) for more info or visit www.ABQHomes.com."  *Id.* ¶ 2(C).  In real estate searches on the Southwest MLS Website, ABQHomes.com is displayed at the bottom of each page for all of the Creek's listings.  *Id.*  Contrary to his sworn statements, defendant Rodriguez had ample exposure to plaintiff's use of ABQHOMES®.

(*Id*. 2-3 (citations to exhibits omitted) (emphasis in original).)

The Court finds Defendant's proffer - i.e., that Plaintiff's mark is already weak - unavailing.  The volume of visitors to ABQhomes.com and especially the substantial percentage of those visitors who type "ABQhomes.com" into their browser, alone, is significant.  In addition, the fact that there are other web pages with names similar to ABQhomes.com is not to the contrary.  As discussed above, Plaintiff showed that those cites neither have a comparable web presence to that enjoyed by ABQhomes.com, nor appear in the business pages of the Albuquerque phone book.  (Second F. Creek Decl. ¶5.)  Therefore, at most, the cites that Defendant points to constitute "inconsequential" uses of the mark; Defendant's showing fails to show that ABQHOMES is already weak.  *Cf. L.D. Kichler Co. v. Davoil, Inc*., 192 F.3d 1349, 1352 (Fed. Cir. 1999) (district court "erred in suggesting that *any* use by others is sufficient to preclude an applicant's declaration of 'substantially exclusive' use" (emphasis added) (quoting 15 U.S.C. § 1052(f)); *Unique Sports Prods., Inc. v. Babolat VS*, 403 F. Supp. 2d 1229, 1239 (N.D. Ga. 2005) (same).

The second exception bars the presumption of irreparable harm from applying where plaintiffs

fail to promptly seek relief: "'Delay in seeking relief . . . undercuts any presumption that infringement

alone has caused irreparable harm . . . ; therefore, such delay may justify denial of a preliminary

injunction for trademark infringement.'" *Id.* (quoting *GTE Corp.*, 731 F.2d at 678). Here, Plaintiff

promptly sought relief when it learned of Defendant's use of the term:

> In late February, 2007, Fred and Sandra Creek first became aware of Mr. Rodriguez's
> appropriation of ABQHOMES. In early March, 2007, the Creeks through their
> attorney informed Mr. Rodriguez of their prior rights and registrations and their
> extensive use of the identical mark for almost a decade in the same market. They
> requested that Mr. Rodriguez cease and desist using the identical mark because of the
> potential customer confusion. *Id.* Lawyers for the parties corresponded until late
> April, when defendant refused to cease and desist use of the mark ABQHOMES and
> claimed a superior right to use the mark based on his late 2006 [Commission]
> registration. He continues to use ABQHOMES in his business.

(Pl.'s Mem. in Supp. Mot. Prelim. Inj.. 6 (citations to supporting declarations, and exhibits thereto,

omitted)); *cf. GTE Corp.*, 731 F.2d at 679 (three year delay by plaintiff precluded presumption of

irreparably injury). Therefore, neither exception precludes the presumption's application here.

Having found Plaintiff made the requisite prima facie showing of infringement under the

Lanham Act, the irreparable-harm presumption applies. *Lorillard Tobacco Co.*, 213 F. App'x at 657;

*see Amoco Oil Co.*, 809 F.2d at 663. The Court notes that, even if irreparable injury presumption

can no longer be presumed, Plaintiff has demonstrated that he is likely to suffer irreparable harm

absent the injunction issuing. *See eBay, Inc.*, 126 S Ct. at 1839-41 (patent infringement) (rejecting

Federal Circuit's "general rule that courts will issue permanent injunctions against patent infringement

absent exceptional circumstances") ("[A]s in our decision today, this Court has consistently rejected

invitations to replace traditional equitable considerations with a rule that an injunction automatically

follows a determination that a copyright has been infringed . . . . We hold only that the decision

whether to grant or deny injunctive relief rests within the equitable discretion of the district courts,

and that such discretion must be exercised consistent with traditional principles of equity"); *see 800 Adept, Inc. v. Murex Sec., Ltd.*, No. 6:02-cv-1354-Orl-28DAB, 2007 WL 1101238, at *5 (M.D. Fla. Apr. 12, 2007) ("[*eBay, Inc.*] made clear that courts should apply the *traditional four-factor test* used by [a] court of equity when considering whether to award permanent injunctive relief to a prevailing patent holder." (emphasis added)); *cf. Novozymes A/S v. Genencor Intern., Inc.*, 474 F. Supp. 2d 592, 612 (D. Del. 2007) ("[*eBay*] simply rejected the proposition that the patentee's right to exclude should *always* lead to injunctive relief for patent infringement." (emphasis added) (citation omitted)); *see also Lorillard Tobacco Co.*, 213 F. App'x at 657 (declining to consider whether, after *eBay*, a "prima facie case of trademark infringement establishes irreparable harm, per se" where plaintiff failed to satisfy other prongs of preliminary injunction test); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 n.9 (Fed. Cir. 2006) (declining to address whether "applying . . . a presumption [of irreparable injury in a patent case] is in direct contravention of the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*" where the plaintiff "established several kinds of irreparable harm").

Irreparable injury to Plaintiff stemming from Defendant's continued use of "ABQ Homes" is amply demonstrated by several factors. As noted above in finding ABQHOMES protectable, Plaintiff stands to lose a great deal from the confusion caused by Defendant's mark: (1) good will acquired from nine years' continuous use; (2) nearly $70,000 spent in advertising and otherwise promoting the mark; and (3) the significant number of visitors to ABQhomes.com each month, especially given that 40% of his clients first contact him after visiting the web page. The risk that such harm will result is heightened given the parties' marks striking similarity: (1) they are physically extremely alike and aurally identical; (2) both parties use their web pages to market their services, which - save the Internet suffix - are identical; and (3) Defendant's intent in adopting ABQ Homes

in November 2006 is questionable at best.  Notably, "'once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted.'"  *Burgess v. Gilman*, 475 F. Supp. 2d 1051, 1055 (D. Nev. 2007) (quoting *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 n.3 (9th Cir. 1989)).

The Tenth Circuit's decision in *Australian Gold, Inc v. Hatfield*, 436 F.3d 1228 (10th Cir. 2006), further bolsters the conclusion that irreparable harm will result absent preliminary injunctive relief.  The *Australian Gold* court recognized the significance of "initial interest confusion," a type of potential confusion:

> Initial interest confusion results when a consumer seeks a particular trademark holder's product and instead is lured to the product of a competitor by the competitor's use of the same or a similar mark. Even though the consumer eventually may realize that the product is not the one originally sought, he or she may stay with the competitor.  In that way, the competitor has *captured the trademark holder's potential visitors or customers.*

*Id*. at 1238-39 (emphasis added) (holding that "likelihood of confusion" can be shown in the form of initial interest confusion).  The Tenth Circuit emphasized that "[i]nitial interest confusion in the internet context derives from the unauthorized use of trademarks to *divert internet traffic*, thereby capitalizing on a trademark holder's goodwill."  *Id*. (emphasis added).  Though discussed under the "substantial likelihood of success" analysis, *Australian Gold*'s reasoning is equally useful here.

Simply put, under the circumstances at bar, and especially in light of the Internet's importance to Plaintiff's business, irreparable harm to Plaintiff's "good will," "reputation," and "years of investment" in the ABQHOMES mark is very likely to result, absent injunctive relief.  *See id*.  It is also clear that money damages will not afford Plaintiff adequate relief.  Quantifying how many "potential visitors or customers" Defendant's mark "captured" from Plaintiff during the pendency of

this case, let alone how to assess the likely damage to the goodwill associated with Plaintiff's mark, would be all but impossible. *See id.* Equitable relief is, therefore, appropriate. (*Id.* 18.) The Court is convinced that Plaintiff made the requisite showing of irreparable harm.[14]  *See eBay, Inc.*, 126 S Ct. at 1840-41; *see, e.g.*, *Burgess*, 475 F. Supp. 2d at 1063 ("Money damages are considered inadequate for a continuing wrong in a trademark case, and we so find here, because denying injunction relief would force the wronged party to endure continuing infringement and to bring successive suits for money damages." (citing *Foxtrap, Inc., v. Foxtrap, Inc.*, 671 F.2d 636, 639 (D.C. Cir. 1982)).

### 3.  Balance of harms.

Whether Plaintiff's alleged injury "outweighs any prospective injury" to Defendant is a sliding scale. *Summum*, 483 F.3d at 1056.  Notably, the Tenth Circuit has made clear that:

> the more likely a movant is to succeed on the merits, the less the balance of irreparable harms need favor the movant's position . . . . where there is a strong indication that the plaintiff is correct on the merits, the less it is likely that the defendant will be harmed by the issuance of a preliminary injunction.

*O Centro Espirita Beneficiente Uniao Do Vegetal*, 389 F.3d at 1002 (internal brackets, quotation marks, and citation omitted).

Defendant contends he will "incur considerable costs" if the injunction issues:

> will have to pay the cost to register a new trade name with the Commission, repay Multiple Listing Service Dues, obtain a new business license, replace marketing signs and office signage, change insurance coverage, replace business cards and other paper goods and alter his website. Additionally, he will have to change his tax information, terminate his current listings and renew all listing contracts under a new trade name. Furthermore, . . . he will have to change all of his bank accounts, credit cards and advertising accounts to reflect a different trade name.  Such disruption is likely to cause substantial disruption and injury to Mr. Rodriguez'. [sic]

---

[14]*See supra* note 4.

(Def.'s Resp. 10; Def.'s Supplemental Resp. 1-3.)  Plaintiff counters that Defendant's use of a term "*identical*" to Plaintiff's ABQHOMES mark "as the *name* of his competing business in the same community" outweighs any harm to Defendant caused by the injunction.  (Pl.'s Reply 4 (second emphasis added).)

Plaintiff's position clearly cuts both ways.  *Cf. Summum*, 438 F.3d at 1056 ("[T]he city's *potential* harm must be weighed against Summum's *actual* First Amendment injury.").  While Plaintiff's likely injury from the continued use of Defendant's identical mark is clear, Defendant's harm involves more than  merely  "minor administrative difficulties and . . . inexpensive registration fees." (Pl.'s Reply 4.)  To the contrary, Defendant is certain to incur non-trivial harm if an injunction issues: *actually* changing the *name* of his business.  *See, e.g.*, *GTE Corp.*, 731 F.2d at 679 ("If [defendant] Williams must change his trade name now, it is probably unrealistic to expect he would change the name back . . . if he won on the merits.").

Ultimately, however, the fact Defendant began using his mark less than six months ago - as compared to Plaintiff's nine years of investment in, and promotion of, the ABQHOMES mark - and Plaintiff's strong showing that he is likely to prevail on the merits, tips the scales squarely in Plaintiff's favor.  *See O Centro Espirita Beneficente Uniao Do Vegetal*, 389 F.3d at 1002.  In addition, Defendant's disingenuous claims that he was unaware of Plaintiff's mark when he adopted ABQ Homes as his business name and displayed it prominently on his promotional materials and in his web page address makes even more evident that Plaintiff's harm substantially outweighs his arguably "self-inflicted harm."  *Cf. S & R Corp. v. Jiffy Lube Int'l*, 968 F.2d 371, 379 (3d Cir. 1992) (defendant stopped paying royalties under franchise agreement) ("self-inflicted harm is far outweighed by the immeasurable damage done [to the plaintiff] by the infringement"), *quoted in Tsunami Softgoods, Inc.*

*v. Tsunami Int'l, Inc.*, No. 2:00CV738K, 2001 WL 670926, at *3 (D. Utah Jan. 19, 2001) (same). As such, Plaintiff's alleged injury, detailed at length above, outweighs harm to Defendant and, therefore, "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted." *See eBay, Inc.*, 126 S. Ct. at 1839.

### 4. Public interest.

"[W]hether granting the injunction would be contrary to the public interest" is the final preliminary-injunction factor. *See Summum*, 483 F.3d at 1056. As the *Pimentel* court explained:

> "Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3rd Cir. 1990). The Tenth Circuit has adopted six factors, originally from the Restatement of Torts § 729 (1938), as the test for determining likelihood of confusion: (i) the degree of similarity between the marks; (ii) the intent of the alleged infringer in adopting its mark; (iii) evidence of actual confusion; (iv) the relation in use and the manner of marketing between the goods or services marketed by the competing parties; (v) the degree of care likely to be exercised by purchasers; and (vi) the strengths or weaknesses of the marks. *See King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089-90 (10th Cir. 1999). This list is not exhaustive, and certain factors weigh heavier in specific types of cases. *See Heartsprings Inc. v. Heartsprings Inc.*, 143 F.3d 550, 554 (10th Cir. 1998). The factors are interrelated, and the court must consider all of them.

*Pimentel*, 2005 WL 3664269, at *6. Notably, "[i]n cases involving either a confusion of source or a confusion of sponsorship," as here:

> the similarity of the marks will weigh most heavily. *See King of the Mountain Sports, Inc.*, 185 F.3d at 1090. The degree of similarity between marks are tested in regard to sight, sound, and meaning, and "in the context of the marks as a whole as they are encountered by consumers in the marketplace." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986). Furthermore, "[s]imilarities are to be weighed more heavily than differences, especially when the trademarks are used on virtually identical products packaged in the same manner." *Id.*

*Pimentel*, 2005 WL 3664269, at *6.

Plaintiff argues that an injunction "is in the public's interest, as real estate clients are likely to be confused and have been confused by defendant's use of the same mark." (Pl.'s Mem. in Supp. Mot. Prelim. Inj. 1-2; Pl.'s Reply 12.) Defendant contends that issuing a preliminary injunction would be "adverse to the public interest." (Def.'s Resp. 10.) The Court concludes that a preliminary injunction issuing here would not be at odds, but instead would further, the public's interest in not being confused by the parties' strikingly similar marks.

### C.   Plaintiff is required to post a $40,000 bond.

Pursuant to Fed. R. Civ. P. 65:

> No . . . preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c). The Court finds it proper - given the extraordinary relief that is to issue, and the fact the injunction will necessitate Defendant changing the name of his business, at minimum during this litigation's pendency - for Plaintiff to post a $40,000 bond, in a form acceptable to the Court. This amount is appropriate because Defendant anticipates that he will incur approximately $17,672.38 in costs and damages in the event a preliminary injunction issues. (Def.'s Supplemental Resp. 1-2.) To ensure Defendant's potential injuries can be compensated, the Court doubled Defendant's anticipated costs and damages, and then rounded up. *Accord Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000) ("When setting the amount of security, district courts should err on the high side."); 5 McCarthy § 30:55 (same).

## III.   Conclusion.

The preliminary injunction analysis is, as evidenced by this Memorandum Opinion and Order's

length alone, intensive and fact-specific.  And rightly so given the extraordinary nature of that relief.

But this should not muddle the bottom line here.  *See Team Tires Plus, Ltd.*, 394 F.3d at 833-34

("The key inquiry in a trademark infringement case is the likelihood of confusion between two similar

marks.").  That is, that Defendant's use of ABQ Homes presents a "trifecta" of confusion.  Plaintiff

and Defendant are using the *same mark*, in the *same city*, in the *same business*.

Plaintiff made the requisite, burdensome showing as to all four prongs of the preliminary

injunction analysis.  *See eBay, Inc.*, 126 S. Ct. at 1839; *GTE Corp.*, 731 F.2d at 679.  His "right to

relief" is, therefore, "clear and unequivocal."  *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d

1061, 1066 (10th Cir. 2001) (internal quotation marks and citation omitted).

For all the foregoing reasons, and as previously stated in the Court's June 15, 2007 Order

Granting Preliminary Injunction (Doc. 19), Plaintiff's Motion for Preliminary Injunction (Doc.6), filed

May 16, 2007, is **granted**, Defendant is **enjoined**, pursuant to Fed. R. Civ. P. 65(d), from any use

of the ABQ Homes mark in his real estate business, and Plaintiff is required, pursuant to Fed. R. Civ.

P. 65(c), to **post a $40,000 bond** in a form acceptable to the Court.

**IT IS SO ORDERED.**


_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**